# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

S.A.A.,

Plaintiff,

vs.

Maple Grove Police Officer Samantha Geisler,
Hennepin County Jail Doctor Sally Zanotto,
Hennepin County Sheriff Deputy Sabrina Demars,
Hennepin County Sheriff Deputy Kenneth Hall,
Hennepin County Sheriff Deputy David
Lewandowski, Hennepin County Sheriff Deputy
Kendric Tjia and Hennepin County,

Defendants.

Case No.: 21-cv-02071-PJS-HB

**THIRD AMENDED
COMPLAINT AND
DEMAND FOR JURY
TRIAL**

The above captioned Plaintiff for her causes of action against the above-named Defendants, states and alleges as follows:

## THE PARTIES

1.     Plaintiff S.A.A. is a Permanent Resident of the United States and at all relevant times was a resident of Dayton, Minnesota. Plaintiff is a devout Muslim. Due to safety and privacy concerns, Plaintiff has chosen to be identified by her initials S.A.A.

2.     Defendant Samantha Geisler, was at all times relevant hereto an officer of the Maple Grove Police Department, acting in the capacity of agent, servant, an employee of Maple Grove Police Department, and within the scope of her employment as such.

1

3.     Defendant Hennepin County Jail Doctor Sally Zanotto, MD was at all times relevant hereto an employee of Hennepin County, acting in the capacity of agent, servant, an employee of Hennepin County, and within the scope of her employment as such.

4.     Defendant Officer Kenneth Hall was at all times relevant hereto an officer ofthe Hennepin County Sheriff's Department, acting in the capacity of agent, servant, an employee of Hennepin County, and within the scope of his employment as such. Kenneth Hall shackled Plaintiff to a gurney in the ambulance. Kenneth Hall rode with Plaintiff to the hospital in the ambulance and guarded her at the hospital.

5.     Defendant Officer David Lewandowski was at all times relevant hereto an officer of the Hennepin County Sheriff's Department, acting in the capacity of agent, servant, an employee of Hennepin County, and within the scope of his employment as such. David Lewandowski shackled Plaintiff to a gurney in the ambulance. He guarded Plaintiff in the ambulance and at the hospital.

6.     Defendant Officer Kendric Tjia was at all times relevant hereto an officer of the Hennepin county Sheriff's Department, acting in the capacity of agent, servant, an employee of Hennepin County, and within the scope of his employment as such. Kendric Tjia shackled Plaintiff to a gurney in the ambulance. He guarded Plaintiff in the ambulance and at the hospital.

7.     Defendant Officer Sabrina Demars was at all times relevant hereto an officer of the Hennepin County Sheriff's Department, acting in the capacity of agent, servant, an employee of Hennepin County, and within the scope of her employment as such. Sabrina DeMars shackled Plaintiff to a hospital bed. She guarded Plaintiff in the hospital.

8.     Hennepin County, Minnesota, is a municipal corporation and the public employer of the Defendants Zanotto, Sabrina DeMars, Kenneth hall, David Lewandowski, and

2

Kendric Tjia.

## JURISDICTION

9.       This action arises under the Fourth, Eighth and Fourteenth

Amendment to theUnited States Constitution, 42 U.S.C. §§ 1983 and 1988, and Minnesota

state law.

10.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331,

1343(a)(3) and (4), and 1367(a).

11.      This Court has supplemental jurisdiction of Plaintiff's state law

claims pursuant to 28 U.S.C. § 1367.

## VENUE

12.      Venue is proper in the District of Minnesota, as the acts and

transactions complained of herein all occurred within this District.

## JURY DEMAND

13.      Plaintiff demands trial by jury.

## FACTUAL ALLEGATIONS

**A.      Traumatic background of Plaintiff's arrest**

14.      Plaintiff S.A.A. is a twenty-eight-year-old woman. She lives in Dayton,

Minnesota with her family.

15.      On January 7, 2020, Plaintiff was 38 weeks pregnant.

16.      In the months leading up to her due date, Plaintiff received prenatal care

from her obstetrician at Allina Health Mother Baby Center. Plaintiff planned to deliver her

baby at that hospital under her obstetrician's care, and with her husband and family by her

side.

17.      On January 7, 2020, at approximately 4:20 p.m., Plaintiff was cooking

3

dinner in the kitchen at her Dayton Minnesota home. Plaintiff's husband F.H. was sitting in the living room working on his laptop with headphones on.

18.     At approximately 4:22 p.m., July 7, 2020, Sergeant Greg Burstad of Dayton Police; Detective James Kirkey, Officer Matthew Olson, Officer Samantha Geisler, and Aaron Schonning of Maple Grove Police department, gathered at Plaintiff's home to execute a search warrant against Plaintiff's husband.

19.     Officer Matthew Olson pounded on Plaintiff's door and simultaneously announced "Police, search warrant, open the door." Officer Olson then verbalized "open the door, open the door." Officer Olson then began to kick in the door with his boot.

20.     All Plaintiff heard was someone knocking and yelling outside her front door. Plaintiff's husband did not hear the police officers identify themselves as police. When F.H.  looked outside all he saw was Detective James Kirkey dressed in plain clothes in front of their front door. The officers' vehicles were parked far away so Plaintiff and F.H.  could not see them from their window. F.H.  told Plaintiff to call 911 and report men trying to break into their home.

21.     Plaintiff called 911 and attempted to tell the operator that men were attempting to break into her home. She was so nervous and scared that the 911 operator could not understand what she was saying. F.H.  told the 911 operator that men were trying to break into their home.

22.     Officer Olson kicked Plaintiff's front door three times before F.H.  fired three shots from a handgun, one out the window and two others through the open front door aimed at the ground. One of the police officers returned fire. Plaintiff was still on the phone with 911 during this time.

4

23.     Plaintiff was scared for her life. She was terrified that she was going to be a victim of an Islamophobic hate crime.

24.     Minutes passed before the 911 operator told Plaintiff and her husband that the men trying to break into her home were police officers.

25.     F.H. put down his gun, went outside, and puts his hands in the air. He yelled to the officers outside informing them that Plaintiff was pregnant.

**B.     Defendant Geisler Used Excessive Force to Arrest and Confine Plaintiff Without Probable Cause**

26.     Plaintiff rushed to put on a hijab and a blanket to cover herself. She followed officers' instructions and walked out of her home with her hands in the air. She had six officers pointing guns at her. She walked towards officer Samantha Geisler who was screaming commands at her.

27.     Officer Geisler told Plaintiff to put her hands behind her back. Plaintiff complied and officer Geisler violently threw Plaintiff down onto her knees onto the cold concrete driveway. Officer Geisler then slammed Plaintiff's pregnant belly down onto the driveway forcing her to lie prone to the ground.

28.     Plaintiff screamed in agony and told officer Geisler that she was pregnant. Officer Geisler then handcuffed Plaintiff in the front of her body. Plaintiff's knees were bleeding, her belly had a red mark, and she immediately had severe back pain. It is Plaintiff's belief that this excessive force caused her to go into labor right then.

29.     Plaintiff was arrested and placed into a Hennepin County Sheriff's vehicle for three hours before she was transferred to the Maple Grove Police Department.

30.     At 11:00 P.M. on January 7, 2020, Plaintiff was transferred from the Maple Grove Police Department to the Hennepin County Jail.

5

31.     At no time during this ordeal did Plaintiff resist any officer, nor did she refuse to comply with any commands.

32.     Plaintiff was arrested under Felony First Degree Assault.

**C.     Plaintiff was denied medical care while in labor.**

33.     The night of January 7, 2020, through the early morning of January 8, 2020' was horrific for Plaintiff. She did not sleep. She was suffering severe back pain and labor pains.

34.     At 7:00 A.M. on January 8, 2020, Plaintiff asked to see a doctor because she was in labor.

35.     Plaintiff was seen by Defendant Zanotto. Defendant Zanotto touched Plaintiff on the belly and told her "she was just stressed." Defendant Zanotto only saw Plaintiff for five minutes.

36.     Plaintiff spent the rest of January 8, 2020, in severe labor pain.

37.     Plaintiff only slept one hour the night of January 8, 2020. She woke up at 5:00 A.M on January 9, 2020. She was having severe pain when her water broke.

38.     Plaintiff told Hennepin County Jail nurse Kimberlee Makhloufi RN that her water had broke and she was giving birth. Kimberlee Makhloufi did not believe her. Kimberlee Makhloufi forced Plaintiff to show Kimberlee Makhloufi her soiled pad. It was only then that Kimberlee Makhloufi instructed the Hennepin County Sheriff Deputies to call an ambulance.

39.     At approximately 5:30 A.M., on January 9, 2020, Plaintiff was placed on a stretcher and wheeled to an ambulance for transport to Hennepin County Medical Center.

**D.     Defendants Transport Plaintiff to Hennepin County Hospital Handcuffed to**

6

**the Ambulance Bed and Shackled Her Throughout Her Labor**

40.     Sometime after 5:35 A.M., on January 9, 2020, Defendant Officers Sabrina DeMars, Kenneth Hall, David Lewandowski, and Kendric Tjia accompanied Plaintiff and Hennepin County paramedics in an ambulance bound for Hennepin County Medical Center.

41.     Before the ambulance ride began, either Sabrina DeMars, Kenneth Hall, David Lewandowski, and Kendric Tjia shackled Plaintiff's left leg to the ambulance gurney.

42.     At the time Sabrina DeMars, Kenneth Hall, David Lewandowski, and Kendric Tjia shackled Plaintiff's leg to the ambulance bed, he or she knew that Plaintiff was 38 weeks pregnant and that she was in active labor.

43.     During the ambulance ride, Plaintiff was in severe physical discomfort. The shackles prevented her from alleviating the intense pain of labor because she could not lie on her side. She was verbalizing that she was in extreme pain.

44.     Notwithstanding Plaintiff's screams of pain, Defendant officers refused to remove her shackles.

45.     Plaintiff arrived at Hennepin County Medical Center at approximately 5:45 A.M.

46.     After Plaintiff arrived at Hennepin County Medical Center, she continued to be shackled to the ambulance bed while she was transported from the ambulance to a delivery room.

47.     Either Kenneth Hall, David Lewandowski, or Kendric Tjia guarded the door to the deliver room while Sabrina DeMars stayed in the delivery room with Plaintiff.

48.     Because Defendant officers refused to remove the handcuffs, hospital staff were forced to provide medical care, such as checking Plaintiff's vital signs and monitoring her

dilation levels, while Plaintiff was in restraints.

49.     At one point during labor, Plaintiff asked to use to use the

bathroom. Plaintiff was in severe pain. Either Kenneth Hall, David Lewandowski or

Kendric Tjia removed the shackle from the hospital bed and shackled both of Plaintiff's

legs together. Plaintiff was forced to go to the bathroom with both of her legs shackled

together.

50.     Plaintiff returned from the bathroom and either Kenneth Hall, David

Lewandowski or Kendric Tjia shackled her left leg to the hospital bed.

51.     At 10:25 A.M., on Janury 9, 2020, Plaintiff's 36-hour hold was up. Either

Kenneth Hall, David Lewandowski or Kendric Tjia removed Plaintiff's shackles and left her

alone in the delivery room.

**E.     Plaintiff Gives Birth to Her Son on January 9, 2020**

52.     Plaintiff gave birth to a baby boy, M.H., at approximately 6:56 P.M.on

January 9, 2020.

53.     During her labor and delivery, Plaintiff was physically exhausted and

drained from the hours in police custody, in shackles, without adequate food or sleep. She

struggled to summon her energy for the delivery.

54.     Plaintiff was in severe psychological distress due to the traumatic events

of the days prior.

55.     Doctors and providers did not discharge Plaintiff until January 14, 2020,

five days after she delivered her son. On information and belief, Plaintiff was suffering from

deep distress, anxiety, depression, insomnia, hypervigilance, exaggerated startle response,

intrusive memories of the event, sense of overwhelming doom and efforts at avoidance.

56.     Plaintiff suffered from Post-Traumatic Stress Disorder and severe
psychological problems as a result of this incident.

57.     At no point during her stay at Hennepin County Medical Center did any
of the Defendant Officers reasonably believe that Plaintiff was a risk of harm to herself or to
others, or that she was a flight risk.

58.     At no time during her stay at Hennepin County Medical Center did
Plaintiff resist any Defendant Officer or refuse to comply with any commands.

**F.     Minnesota Ends the Abhorrent Practice of Shackling Pregnant Women**

59.     Medical experts, correctional experts, and maternal and fetal health
experts unanimously agree that pregnant women should not be shackled absent the most
extraordinary circumstances. Such extraordinary circumstances are limited to situations where a
woman poses a risk of injury to herself or others that cannot be addressed by less restrictive
means.

60.     Shackling poses a substantial risk of harm to a pregnant woman's health,
and to the health and safety of the baby, at any stage of pregnancy.

61.     The American Medical Association, the Federal Bureau of Prisons, the
U.S. Marshals Service, the American Correctional Association, the American College of
Obstetricians and Gynecologists, and the American Public Health Association all oppose
shackling pregnant women during labor, delivery, and postpartum recovery.

62.     The American Medical Association issued a policy against shackling in
2010. The AMA found that shackling increased the potential for harm to the woman and baby,

that "freedom from physical restraints is especially critical during labor, delivery, and postpartum recovery," and that "restraints on a pregnant woman can interfere with the medical staff's ability to appropriately assist in childbirth or to conduct sudden emergency procedures."[1]

63.     The American College of Obstetricians opined in 2011 that the use of restraints on pregnant women compromises health care, is demeaning, and is rarely necessary.[2]

64.     Shackles interfere with healthcare providers' ability to conduct necessary tests to ensure the safe and healthy progression of a pregnancy.[3]

65.     Shackling can exacerbate a pregnant woman's already-compromised balance while she is standing or walking, increasing the risk of falls that can injure not only the mother, but also the fetus.[4]

66.     The use of shackles on a pregnant woman in labor can inhibit successful cervical dilation, unnecessarily prolonging her labor.[5]

67.     Women often need to move around during labor, delivery, and recovery to manage pain and avoid complications, including moving their legs as part of the birthing process. Shackling limits a woman's ability to shift positions to manage the extreme pains of labor and childbirth. This can, in turn, decrease the flow of oxygen to the fetus, endangering the health of both the mother and the unborn child.

68.     Shackling women during labor can lead to bruising from leg and abdomen

---

[1] AM. MED. ASS'N, AN "ACT TO PROHIBIT THE SHACKLING OF PREGNANT PRISONERS" MODEL STATE LEGISLATION 1 (2010).

[2] AM. COLL. OF OBSTETRICIANS AND GYNECOLOGISTS, HEALTH CARE FOR PREGNANT AND POSTPARTUM INCARCERATED WOMEN AND ADOLESCENT FEMALES 3 (2011).
[3] Amanda Glenn, *Shackling Women During Labor: A Closer Look at the Inhumane Practice Still Occurring in Our Prisons*, 29 HASTINGS WOMEN'S L.J, 199, 202 (2018).
[4] ACLU Reproductive Freedom Project & ACLU National Prison Project, *ACLU Briefing Paper: The Shackling of Pregnant Women & Girls in U.S. Prisons, Jails & Youth Detention Centers* 3 (2012), https://www.aclu.org/files/assets/anti-shackling_briefing_paper_stand_alone.pdf (hereafter, "ACLU Briefing Paper").
[5] *See* Glenn, *supra*, n.3.

restraints. Leg restraints can also cause severe cuts on women's ankles because of the strains associated with childbirth.[6]

69.     When restraints are used during labor, doctors are limited in how they can manipulate the mother's body for the safety of the unborn child.

70.     During the final stages of labor, it is particularly important for the physician to act quickly to avoid potentially life-threatening emergencies for both the mother and the unborn child. Shackles severely limit physicians' abilities to provide such emergency care, threatening maternal and fetal health.[7]

71.     Using restraints after delivery may prevent mothers from effectively healing and breast-feeding. It also puts new mothers at "substantial risk of thromboembolic disease and postpartum hemorrhage."[8]

72.     In addition to posing serious health risks to a mother and baby, shackling is almost never justified for security reasons.

73.     Among the states that have restricted the shackling of pregnant prisoners, none has documented instances of women in labor escaping or causing harm to themselves, the public, security guards, or medical staff.[9] Since New York City jails restricted the use of restraints on inmates admitted for delivery in 1990, there have been no reported incidents of escape or harm to medical staff.[10]

74.     In 2011, the United States Department of Justice convened a task force to

---

[6] *ACLU Briefing Paper* at 3

[7] AMNESTY INT'L, ABUSE OF WOMEN IN CUSTODY: SEXUAL MISCONDUCT AND THE SHACKLING OF PREGNANT WOMEN 23 (2001).

[8] UNIV. OF CHICAGO L. SCH. – INT'L HUMAN RIGHTS CLINIC, THE SHACKLING OF INCARCERATED PREGNANT WOMEN: A HUMAN RIGHTS VIOLATION COMMITTED REGULARLY IN THE UNITED STATES 6 (2014), https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1008&context=ihrc.

[9] *ACLU Briefing Paper* at 5.
[10] *Id.*

11

address the use of restraints on pregnant women in custody. Its 2014 final report concluded that "[t]he use of restraints on pregnant women and girls under correctional custody should be limited to absolute necessity . . . when there is an imminent risk of escape or harm.........and these risks cannot be managed by other reasonable means ......."[11]

75.     In 2008, the Federal Bureau of Prisons mandated that restraints not be used on women during labor, delivery, or post-delivery recuperation absent compelling circumstances.[12]

76.     Given the myriad complications that can result from the shackling of pregnant women, 22 states and the District of Columbia have adopted laws banning or severely limiting the use of any form of restraints on pregnant women.[13]

77.     Minnesota was part of this movement; in 2014, the state legislature passed the Anti-Shackling Law, which among other things, banned the shackling of pregnant women during labor and childbirth. *See* Minnesota Chapter 234 S.F.No. 2423 (2014).

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs/Substantive Due Process/Excessive Force
(Against All Defendant Hennepin County Deputies)

78.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

79.     At all relevant times, Defendant Deputies were acting under color of state law in their individual and official capacities within the scope of their respective employments as police officers for the Hennepin County Sheriff's Department.

---

[11] NAT'L TASK FORCE ON THE USE OF RESTRAINTS WITH PREGNANT WOMEN UNDER CORRECTIONAL CUSTODY, BEST PRACTICES IN THE USE OF RESTRAINTS WITH PREGNANT WOMEN AND GIRLS UNDER CORRECTIONAL CUSTODY 6 (2014); *see also* United States Marshal Service, Policy 9.1 (Restraining Devices), § (D)(3)(e),(h).
[12] Fed. Bureau of Prisons, *Escorted Trips* §570.45(9)
[13] Ginnette G. Ferszt, Michelle Palmer, & Christine McGrane, *Commentary: Where Does Your State Stand on Shackling of Pregnant Incarcerated Women?*, 22 Nursing for Women's Health J. 17, 18 (2018

80.     At all relevant times, Plaintiff's late-stage pregnancy, labor, and delivery, were serious medical needs.

81.     At all relevant times, Minnesota law expressly prohibited the use of any form of restraints on a pregnant woman in labor, in the hospital, or on a woman who has recently given birth.

82.     At all relevant times, Plaintiff was either 38 weeks pregnant, in labor, and/or in the hospital.

83.     At all relevant times, there was no medical, legal, security, or other need to use restraints on Plaintiff.

84.     At all relevant times, medical and correctional experts agreed that the use of shackles on a pregnant woman during transport, labor, delivery, in the hospital, or post-partum recovery creates significant risk and danger to both the woman and the child.

85.     By shackling Plaintiff, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of herarrest, transport, detention, and hospitalization, Defendant Deputies placed Plaintiff and her unborn and then-infant child at serious risk for potentially life-threatening complications and were deliberately indifferent to Plaintiff's serious medical needs.

86.     By shackling Plaintiff, approving of such restraints and/or failing to intervene to prevent the use of restraints over the course of her arrest, transport, detention, and hospitalization, Defendant Deputies engaged in outrageous and conscience- shocking conduct.

87.     By shackling Plaintiff, approving of such restraints, and/or failing to intervene to prevent the use of such restraints over the course of her arrest, transport, detention, and hospitalization, Defendant Deputies used excessive, brutal, sadistic and unconscionable force on Plaintiff.

13

88.     Defendants acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983 including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments.

89.     As a direct and proximate result of Defendant Deputies' misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

### SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Eight and Fourteenth Amendments
Deliberate Indifference to Serious Medical Needs/Denial of Due Process Right to Adequate Medical Care
(Against Defendant Zanotto)

90.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

91.     While incarcerated at Hennepin County Jail, Plaintiff had a constitutional right under the substantive due process clause of the Eighth and Fourteenth Amendments to the United States Constitution to have her basic human needs met, including receiving adequate medical care. Deliberate indifference to an inmate's serious medical needs constitutes a violation of Plaintiff's Eighth and Fourteenth Amendment rights.

92.     Plaintiff's constitutional rights to receive adequate medical care under the Eight and Fourteenth Amendments was clearly established.

93.     On January 8, 2020, Defendant Zanotto was told by Plaintiff that she was in labor and needed to go to the hospital. Defendant Zanotto did not do any inspection to ascertain whether or not Plaintiff was in labor. Defendant Zanotto blamed Plaintiff's problems on "stress" and sent her back into the regular Jail.

94.     By failing to offer and/or provide timely access to medical attention to Plaintiff while she was in labor at the Hennepin County Jail, Defendant Zanotto placed Plaintiff

14

and her unborn and then-infant child at serious risk for potentially life-threatening complications and were deliberately indifferent to Plaintiff's serious medical needs.

95.     By failing to offer and/or provide timely access to medical attention to Plaintiff while she was in labor at the Hennepin County Jail, Defendant Zanotto engaged in outrageous and conscience- shocking conduct.

96.     As a direct and proximate result of Defendant Zanotto's acts and/or omissions, as described herein, Defendant, while acting under color of state law, deprived Plaintiff of her federal constitutional right to receive adequate medical care in violation of the Eighth and Fourteenth Amendment and 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth Amendment
False Arrest
(Against Defendant Geisler)

96.     Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

97.     By the actions described above, by detaining Plaintiff, Defendant Geisler falsely arrested, unreasonably seized, falsely imprisoned, and detained Plaintiff. The wrongful, unjustifiable, and unlawful apprehension, arrest, seizure, and detention of Plaintiff was carried out with any basis, without Plaintiff's consent, and withoutreasonable suspicion or probable cause.

98.     No reasonable officer would have believed there was probable cause to arrest/unreasonably seize Plaintiff under these circumstances.

99.     From the time Defendant Geisler arrested Plaintiff upon her release from Hennepin County custody, Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, unreasonably seized, and deprived of her liberty. During that period, the unlawful,

wrongful, and false arrest/unreasonable seizure of Plaintiff was without basis and without probable cause or reasonable suspicion.

100.    Defendant Geisler acted under pretense and color of state law. Defendant Geisler acted in abuse of her powers and beyond the scope of her authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff and of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United StatesConstitution.

101.    As a direct and proximate result of Defendant Geisler's misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
42 U.S.C. § 1983: Fourth Amendment – Excessive Force
(Against Defendant Geisler)

102.    All previous paragraphs are incorporated herein by reference as though fully set forth.

103.    Plaintiff makes a claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment of the Constitution of the United States.

104.    Geisler was acting under color of state law at all relevant times.

105.    Geisler's use of force against Plaintiff was excessive.

106.    Wherefore, as a direct and proximate result of the actions of Geisler, Plaintiff has suffered damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
Minnesota Statute § 234 S.F.No. 2423
Unlawful Use of Restraints
(Against All Defendant Hennepin County Deputies)

107.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

16

108.   At all relevant times, Defendant Deputies knew that Plaintiff was pregnant, in labor, or admitted to a hospital for delivery.

109.   At all relevant times, Defendant Deputies used restraints on Plaintiff while she was transported from Hennepin County Jail to Hennepin County Medical Center, while she was in labor, and while she was admitted to the hospital for delivery.

110.   At no point did Plaintiff pose any risk of flight or of any injury to anyone.

111.   Defendant Deputies acted underpretense and color of state law. Defendant Deputies acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her statutory rights.

112.   As a direct and proximate result of the misconduct and abuse of conduct of Defendant Deputies, as detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION
Assault
(Against All Defendant Hennepin County Deputies and Hennepin County)

113.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

114.   By reason of the foregoing, and by threateningly approaching Plaintiff and aiming to unlawfully apply restraints to her, Defendant Deputies, acting in their capacity as Hennepin County Sheriff Deputies and within the scope of their employment as such, intentionally placed Plaintiff in apprehension of imminent offensive contactand displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

115.   The assaults committed by Defendant Deputies were unnecessary and

unwarranted in the performance of their duties as Hennepin County Sheriff's Deputies and constituted an unreasonable use of restraints.

116.    Defendant Hennepin County is vicariously liable to Plaintiff for the Defendant Deputies' Assault.

117.    As a direct and proximate result of the misconduct and abuse of Defendant Deputies, as detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION
Battery
(Against All Defendant Hennepin County Deputies and Hennepin County)

118.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

119.    By reason of the foregoing, and by restraining Plaintiff's legs, Defendant Deputies, acting in their capacity as Hennepin County officers and within the scope of their employment as such, committed a willful, unlawful,unwarranted, and intentional battery upon Plaintiff.

120.    The batteries committed by Defendant Deputies were unnecessary and unwarranted in the performance of their duties as Hennepin County Sheriff Deputies and constituted an unreasonable use of restraints.

121.    Defendant Hennepin County is vicariously liable to Plaintiff for the Defendant Deputies' battery.

122.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages herein before alleged.

## SEVENTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress
(Against All Defendants)

123.    Plaintiff repeats and realleges the above paragraphs as if the same were

fully set forth at length herein.

      124.    Defendant Officers engaged in extreme and outrageous conduct in applying restraints to Plaintiff's arms and legs notwithstanding the fact of her pregnancy.

      125.    In shackling Plaintiff, Defendant Officers ignored the clear risk of harm to Plaintiff and her son.

      126.    Defendant Officers intended to cause Plaintiff severe emotional distress or disregarded the substantial likelihood that their use of restraints would cause Plaintiff such distress.

      127.    Defendant Hennepin County is vicariously liable to Plaintiff for the Defendant Deputies intentional infliction of emotional distress.

      128.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged, including but not limited to severe emotional distress.

      WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

    a.  Compensatory damages against all Defendants in an amount to be determined at trial;

    b.  Punitive damages against Defendant Officers in an amount to be determined at trial;

    c.  Injunctive relief against the Hennepin County Sheriff's Department, including but not limited to ordering the Hennepin County Sheriff's Department to issue policies, training, and procedures prohibiting the shackling of pregnant women during transportation, labor, delivery and

postpartum recuperation;

d. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and

e. Such other and further relief as this Court may deem just and proper.

Dated: 5/27/22

**BRAZIL LAW GROUP**

_____

Nicholas Sweeney (0397702)
1622 West Lake Street
Minneapolis, MN 55408
612-874-6109
nsweeney@djbrazil-law.com
Attorney for Plaintiff